**FRANKLIN SUPPLY COMPANY, etc.,**
**Appellant,**
v.
**Albert W. TOLMAN, Jr. and Peat, Mar-**
**wick, Mitchell & Company, etc.,**
**et al., Appellee.**

No. 24989.

United States Court of Appeals,
Ninth Circuit.

Dec. 16, 1971.

As Amended on Denial of Rehearing
Jan. 7, 1972.

Irwin F. Woodland (argued), Julian O. von Kalinowski, Carl D. Lawson, Robert E. Cooper, of Gibson, Dunn &

Crutcher, Los Angeles, Cal., Helmick, Conover & Burkhardt, Denver, Colo., Victor M. Earle III, New York City (of counsel), for appellant.

Ira C. Rothgerber, Jr. (argued), Robert S. Slosky, of Rothgerber, Appel & Powers, Denver, Colo., Melvin M. Belli, of Belli, Ashe, Ellison, Choulos & Lieff, San Francisco, Cal., Anthony F. Zarlengo, Denver, Colo., for appellee.

Before BARNES, HAMLEY and TRASK, Circuit Judges.

TRASK, Circuit Judge:

This appeal is from a judgment awarding damages to plaintiff below, Franklin Supply Company, from Peat, Marwick, Mitchell & Co., an international certified public accounting firm and defendant below, based upon multiple claims of negligence and misrepresentation; fraud; breach of contract; and fraudulent conspiracy in performing an audit. Also named as a defendant was Albert W. Tolman, a citizen of Texas, representing a class of persons known as Peat, Marwick, Mitchell & Co.

The action was filed in the United States District Court for the Central District of California with jurisdiction founded upon 28 U.S.C. § 1332 (Diversity of citizenship).

Franklin Supply Co. (Franklin) is a Nevada corporation with its principal place of business in Colorado, and is one of the large oil field supply companies in the United States. It entered into an agreement with Servicios Hydrocarb C. A. (Servicios), a Venezuela corporation, to purchase all of the capital stock of Petroleum Industry Consultants C. A. (Peticon), a Venezuela corporation, which was a wholly owned subsidiary of Servicios. Peticon was in the oil field supply business in Venezuela.

Negotiations leading to this transaction began in September 1958, between Gene Harper, president of Franklin, and Robert Champion, the largest individual shareholder of Servicios. Champion made it clear that the Servicios directors would not sell the Peticon stock for an amount less than its book value. Harper said that if Franklin purchased Peticon for book value it would want the inventory valued at the lower of cost or current replacement value. Harper sent William Kerin, Jr., a Franklin vice president and manager of its stores and warehouses, to Venezuela to examine Peticon. Kerin visited all three of the stores of Peticon and submitted to Franklin an unfavorable report on the Peticon inventory.

Nevertheless, Harper arrived in Venezuela in February 1959, with Kerin and William Quan, another Franklin vice president, and negotiations were resumed. Harper again suggested that inventory be valued at the lower of cost or current replacement value. On February 28, 1959, Harper, Kerin and Quan met with the Servicios directors and a tentative agreement was reached. Again the formula for pricing inventory was discussed. Laffan, president of Servicios, suggested that book value be used with Servicios retaining surplus or obsolete lines of inventory. In the end the Harper formula prevailed. It was agreed that Franklin would assume control on May 1, and that the purchase price of stock would be book value of the stock as of April 30, 1959.

The parties then decided to employ Jesse Guy Benson, an American who practiced law in Venezuela, to draft a contract and they also agreed to employ Peat, Marwick, Mitchell & Co. (P.M.M), Servicios' auditors, to perform an audit as of April 30, with each party to share legal and accounting fees equally.

Benson did prepare a draft according to the instructions given to him. Harper received it in March of 1959 and asked Alexander Grant & Co., Franklin's regular auditors, and Franklin's regular Chicago lawyers to review it. Harper later instructed Kerin to sign the document and Kerin, on behalf of Franklin, and Laffan, on behalf of Servicios, did so in Caracas on May 15, 1959. During the week prior to Franklin's take over on May 1, 1959, the inventory of Peti-

con was taken by Norris Culp, Controller of Peticon, and his staff. Inventory items were attempted to be priced at lower first-in-first-out landed costs, or the replacement cost from Peticon's regular suppliers on April 30, 1959. This had been the pricing method in prior financial statements and no substantial errors were made. (Finding of Facts 12, 13, 14. C.T. 1622, 1623).

William Kerin, Jr. and Lee Crogner of Franklin and representatives of PMM observed the taking of the inventory. Prior to and during the period of taking the inventory, Kerin also examined the inventory records and recommended to Harper that Franklin not purchase Peticon. Harper instructed him to buy it nevertheless.

On May 14, 1959, Kerin wrote to Laffan, president of Servicios, and complained of undesirable items of physical inventory, classifying some as slow moving and some as "obsolete or junk." These were itemized and totalled Bs 75,-286.97 (Bolivars).[1] Kerin concluded his letter as follows:

> "Needless to say, the aforementioned figure will have to be considered in connection with the formula used in purchasing Peticon."

Copies were sent to Jesse Guy Benson, Fred Southerland, Gene Harper and William P. Quan. Subsequently, Kerin met with Laffan and others in Caracas on July 2, 1959, and an agreement was made to reduce the total inventory valuation by an amount equal to one-third of the total value of obsolete or junk items, the agreement providing that the "total value of the final inventory shall be reduced by subtracting the sum of Twenty-Five Thousand Ninety-Five and 66/100 Bolivars. (Bs 25,096.66)."

The accountant's report and statement of Financial Position of Net Assets were issued in Venezuela on July 30, 1959. The book value shown was Bs 3,524,-888.25 or $1,052,205.45. In November 1959, Franklin paid $52,205.45 by check

and guaranteed Peticon notes in the amount of $1,000,000 in payment of the purchase price.

In April 1960, Franklin dishonored the first note and in July filed suit in Venezuela to rescind the Peticon transaction. In August, Servicios sued Franklin in the United States District Court in Colorado to collect the notes. Franklin filed counterclaims in that action asserting the over-valuation of inventory. There were other actions and counterclaims as well as unsuccessful attempts to join PMM.

On February 13, 1963, Franklin and Servicios stipulated in Colorado to substitute payments and notes in the sum of $800,000 for the original notes in the sum of $1,000,000. Mutual releases were exchanged and all litigation was dismissed. An amendment was entered into as a part of the stipulation to provide for a reservation of rights by Franklin against PMM.

In April 1963, Franklin filed its present action in the United States District Court for the Central District of California against PMM. The second amended complaint upon which the case was tried charged that PMM did not perform an independent audit because the audit was in the charge of one Fred W. Southerland who was an employee of PMM, but was also an alternate director of Servicios and had been a director of Peticon. Because of this and the failure of PMM to formally disclose these facts, PMM was charged with having acted in violation of a fiduciary relationship and in violation of an implied duty of independence. It was also charged that the audit of PMM did not comply with the agreement of the parties. It was further alleged that there was substantial concealment of the condition of the inventory, in that much of it was obsolete or unsaleable and that certain diamond bit credits constituting a liability of Peticon were not properly shown. Franklin also charged fraudulent con-

---

1. The rate of exchange of Venezuelan bolivars for United States dollars on April 30, 1959, was 3.35 to the dollar.

spiracy between PMM and Servicios to misrepresent the financial condition of Peticon and, finally, a breach of an implied warranty to perform the audit in compliance with generally accepted accounting methods. Compensatory and punitive damages were sought.

The district court held a partial trial in October 1967, in order to determine the effect of the Colorado settlement between Franklin and Servicios and to decide issues of conflict of laws and of Venezuelan law. The court ruled orally at the end of the partial trial and then signed and filed findings and conclusions. Those proceedings and the findings and conclusions will be referred to hereafter as well as other facts as they become pertinent. The trial on all remaining issues was held in April 1969 before the court without a jury. The district court found for the plaintiff and awarded $71,648.47 as compensatory damages for losses on salvage diamond transactions, $63,860 compensatory damages for litigation expenses, $200,000 compensatory damages for over-valuation of inventory in the audit and $150,000 as punitive damages, or an aggregate of $485,508.47.

## JURISDICTION OF THE COURT

Initially, jurisdiction must depend upon diversity of citizenship under Article III, Section 2 of the Constitution and 28 U.S.C. § 1332. The plaintiff is alleged to be a Nevada corporation with its principal place of business in Colorado. The defendant, Tolman, is a citizen of Texas. The defendant Peat, Marwick, Mitchell & Co. is an organization composed of numerous unincorporated associations in which Tolman is a partner or owner of an interest. In addition, there is at least one, and perhaps more corporations of the same name, none of which is domiciled or has its principal place of business in Colorado or Nevada, but all connected with the unincorporated associations of the same name. The court found, pursuant to stipulation, that the executive offices of Peat, Marwick, Mitchell & Co. (U.S.) and Peat, Marwick,

Mitchell (general) are at 70 Pine Street, New York, New York. The Venezuelan Civil Society of Peat, Marwick, Mitchell & Co. was found to be a separate entity from the Peat, Marwick, Mitchell & Co. with which Franklin had dealt, but was connected with Peat, Marwick, Mitchell & Co. (U.S.) and the same firm (general).

Without making an express determination of diversity jurisdiction, the district court proceeded to try the case. We believe it correctly did so. *See* Mason v. American Express Co., 334 F.2d 392 (2d Cir. 1964). The appellant has not questioned the trial court's determination of jurisdiction on appeal to this court.

## INTRODUCTION TO SPECIFIC ISSUES

The trial of the action was divided into two parts. The first portion in October 1967, was for the purpose of receiving evidence to enable the court to resolve the relationship of PMM to Franklin, whether of a fiduciary nature or not, and if the latter, whether PMM violated its fiduciary duty; the effect of the Colorado settlement; questions of Venezuelan law; and questions of conflicts of law.

On these issues the district court held that PMM was in a fiduciary relationship with Franklin and had violated its duty; that the Colorado settlement did not operate to bar the existing action, nor did the dismissal of a rescission suit in Venezuela; and, that most of the issues of law were to be determined according to the law of Colorado.

The second portion of the trial in 1969 was concerned with the substantive issues of the meaning of the terms of the contract between Franklin and Servicios as to valuations, the extent to which the audit by PMM was properly completed and the damages resulting.

At the conclusion of the second and final portion of the trial the court made findings of fact from which conclusions of law were drawn. These incorporated and supplemented the earlier rulings. The court determined that PMM had

breached the terms of its audit engagement because it did not price the inventory of Peticon at the lower of cost or replacement market value. It concluded that the negligent failure of PMM to define in writing its understanding of the inventory pricing formula amounted to fraud. (Later the court concluded as a matter of law that the circumstances of non-disclosure amounted to "constructive fraud"). Other findings and conclusions will receive comment as they become relevant.

## ACCOUNTING PROBLEM

Paragraph Second of the contract of May 15, 1959, between Franklin and Servicios provided that the sales price of the Peticon stock should be book value as of April 30, 1959, as determined by PMM. It further provided that in determining book value the inventory items would be priced at cost or current replacement value whichever was lower.

Two critical problems emerge from this provision. The first relates to the alleged duty of PMM to make an independent audit; the second questions whether PMM did comply with the valuation formula.

1. PMM had been the regular accountants of both Servicios and of Peticon, and Fred Southerland who was in charge of the Venezuela office of PMM undertook the responsibility of supervising the accounting work necessary to determine book value as the contract provided. The fact that PMM had been the accounting firm used by Servicios and its wholly owned subsidiary appears to have been well known. Southerland's personal connection with each of the two firms was not. He had been the president of Peticon in 1956, and during the contract negotiations in 1958 and 1959 was a member of the Board of Directors of Peticon. It was stipulated between the parties, however, that at the first special meeting of the shareholders of Peticon under control of Franklin held on May 16, 1959, Southerland's resignation as alternate director of Peticon was accepted and one or more representatives

of Franklin were elected to the Board. Southerland as still retained as comisario. Copies of the minutes of this meeting were sent to Franklin representatives and received by them. This occurred long prior to the audit which was issued on July 30, 1959.

Southerland was also an alternate director of Servicios upon the date of the contract and during the audit. The actual knowledge of Franklin about both of these relationships is in dispute and the court's findings are in some conflict. In its Conclusion of Law Number Six at the termination of the first partial trial, the court found that Franklin had no actual knowledge of Southerland's prior relationships with Peticon. This conclusion of law does not appear to be supported by the stipulation noted above. There was disputed testimony whether Southerland informally told Franklin's vice president, Quan, about his relationship to both companies, concerning which the court expressly made no finding. The court did make a finding at the request of the plaintiff that the evidence indicated no intentional attitude or desire of Mr. Southerland to defraud anybody. On the basis of testimony of plaintiff's expert witness, Kohler, the court found that there was a duty on PMM to make a formal disclosure of Southerland's relationships in the audit report.

We can agree that this would have been better accounting practice. We cannot agree that under the circumstances of this case the failure to do so constitutes legal fraud. We have not had referred to us any cases so holding, nor have we found any. This is not a case such as Trussell v. United Underwriters, Ltd., 228 F.Supp. 757 (D.Colo. 1964), cited by appellee, where numerous purchasers of securities sought relief under the provisions of the Securities Exchange Act of 1934. The court there held that under particular provisions of the Act it was necessary to find that misstatements or half-truths were knowingly or intentionally made, while under other sections a violation could be found

for constructive fraud from a totality of circumstances. No question of interpretation of the Securities Act is involved here.

■ The trial court here held that PMM was in a fiduciary relationship with the plaintiff when it accepted its engagement. From that point it appeared to hold defendant to the degree of integrity and fidelity of a trustee. Appellee frankly admits that there is no Colorado case squarely holding that an accountant as such is a fiduciary.[2] A "fiduciary relation" is an elusive status to define. More often a fiduciary is a person who holds property or things of value for another—a trustee, executor, receiver, conservator or someone who acts in a representative capacity for another in dealing with the property of the other. Here, PMM was acting more in the capacity of arbitrator or fact finder not for one but for two persons. The duty of PMM was not to act as a fiduciary for Franklin; it was, rather, to act independently, objectively and impartially, and with the skills which it represented to its clients that it possessed, to make accurate determinations of fact. It would be liable for acting negligently or fraudulently.

■ We do not say that a certified public accountant may never be a fiduciary. We do say it was not here. The case most closely in point is Gammel v. Ernst & Ernst, 245 Minn. 249, 72 N.W. 2d 364 (1955) where a national accounting firm engaged to perform an audit was "required to work with the same skill and care exercised by an average person engaged in the trade or profession involved." 72 N.W.2d at 368.

2. The second issue which is argued on the basis of the contract is the nature and extent of the duty of PMM to determine book value according to the pre-

scribed formula and whether it did so. The trial court found that PMM did not price the inventory according to the formula and thus was negligent in performing its assignment or was in violation of an "implied warranty." It also found as a fact that PMM acted fraudulently "through negligent failure to advise the plaintiff of the basis upon which inventory valuation was made" and through failure to disclose Southerland's relationships.

The audit report did in fact state on its face that the valuation was made on the contract formula. The plaintiff contended and the court found that this was not sufficient. Items of inventory could be replaced either by purchasing them new through Peticon's regular suppliers, or they could be replaced by purchasing surplus items on a local market when available. The pricing of items at their market price on the local market where such items were surplus would result in a lowering of the value of the inventory.

An audit prepared by Arthur Andersen & Co., which was introduced in evidence, had re-examined the inventory pricing and made a computation showing that had the price of *surplus* materials been used for fixing replacement value, the PMM figures for inventory value could be reduced approximately $465,000. However, because some of the surplus lists used by Andersen were questionable, and because some of the surplus items might not have been available, the trial court "discounted" the overvaluation figure of Arthur Andersen & Co. It found that:

> "On the totality of the evidence . . . the inventory . . . was overpriced to the extent of $200,000."

Much evidence was introduced by expert witnesses on both sides as to the meaning of "current replacement value"[3]

2. The trial court determined that the law of Colorado controlled because it was the place of performance.

3. Mr. Eric Kohler, a well-known Certified Public Accountant, and the author of

Kohler's Dictionary for Accountants, defined replacement cost or value. He was an expert witness on behalf of the plaintiff. There were also expert witnesses on behalf of the defendant. *See* note 5 *infra*.

and of the duty of PMM to detail its understanding of the meaning of the term in its report. The trial court found that such a duty did exist and that PMM failed to properly define its terms. We do not disturb those fact findings. The trial court also found that had the formula been properly applied it would have required the use of prices of surplus materials where available, instead of the price from Peticon's regular source of supply. We have had some difficulty with this finding of the court and its findings based upon the testimony of witnesses used by Andersen in its "reexamination" of the PMM figure by the use of price lists for surplus materials. We believe, however, that there is sufficient evidence to support those findings and we do not disturb them.

Another aspect of the accounting problem played a significant role in the trial court's finding of fraud or constructive fraud by PMM. Finding Number Seven made at the conclusion of the case and at the request of the plaintiff was as follows:

> "7. Mr. Southerland interpreted the clause as he thought it should be interpreted, which was exactly as Mr. Laffan, the president of Servicios, thought it should be. The objective result was that the seller fixed its own price for sale according to its own formula." C.T. 1613.[4]

The "clause" which is referred to is the formula "cost or current replacement value, whichever is the lower." This formula, however, had not been originated by Mr. Southerland. In the initial negotiations for the sale of Peticon stock when the offer to sell was for book value, Mr. Harper, president of Franklin, stated that if the book value were used, Franklin would want the inventory valued at the lower of cost or current replacement value. At a later date, in Maracaibo, Harper again suggested that inventory be valued at the lower of cost or current replacement value. At a third meeting in Caracas with members of the Peticon board, Laffan of Peticon suggested the inventory be priced at cost, but Harper insisted that the formula be as he had originally suggested.

Although the contract in this form was submitted to Franklin's Chicago attorneys and to its accountants, no one suggested a further definition of the formula, although there was discussion that if Peticon's current suppliers could supply an item for less than cost, this price should be used. This is what was done. The expert testimony on this subject was conflicting but the practice actually followed by PMM in interpreting replacement value as the current costs from usual and regular sources of supply received substantial support.[5]

Thus the finding that PMM, through Southerland, adopted a construction the result of which was "that the seller fixed its own price for sale according to its own formula" seems overdrawn. Particularly does this seem so when we consider that Franklin took over control and operation of Peticon on May 1, 1959, although the contract was not executed until May 15, 1959, and the audit report not issued until July 30, 1959. The closing was not until November 1959, when payment by cash and notes was made

4. This was substantially the same as Finding Number Twenty-four by the court at the conclusion of the partial trial.

5. Paton, Accountants Handbook § 10 at 561 (3d ed. 1947) Current replacement cost (value) is defined to mean:
 "Usually deemed to mean the price at which the goods in the inventory could be purchased at the inventory date from the regular sources of supply and in shipments in sizes ordinarily handled, including all applicable costs of transportation and handling."

Robert Trueblood, former President of the American Institute of Certified Public Accountants defined "replacement value" as "current costs from usual and regular sources for an identical item."

Carman Blough, former research director of the American Institute of Certified Public Accountants, testified that "current replacement value" meant "what it would cost to replace those goods today in the quantities and from the sources that are customarily used by the company in making its purchases."

and the stock transferred and pledged to secure the debt. Even before takeover on May 1, 1959, Franklin sent one of its representatives, vice president William Kerin, to Venezuela to investigate Peticon as early as November 1958. There was therefore nothing clandestine about the operations of Peticon or its business records insofar as the potential buyer was concerned, and its auditors, accountants and investigators had more than three months before closing to investigate physical inventory, the local markets and other markets for inventory pricing purposes with the PMM audit report in their hands.

■ Accepting the trial court's findings that Southerland should have made a written statement in the audit report of his association with Servicios as an alternate director and that he should have defined his understanding of the term "current replacement value," we do not agree that it must be concluded therefrom as a matter of law that Southerland and PMM were guilty of fraud. For actual fraud to exist, assuming Colorado law to apply, more than nondisclosure must exist. There must be actual concealment. As the Supreme Court of Colorado held in Teodonno v. Bachman, 158 Colo. 1, 404 P.2d 284, 285 (1965):

"We have held that actionable concealment consists of (a) the concealment of a material existing fact which in equity and good conscience should be disclosed; (b) knowledge that one is concealing such a fact; (c) ignorance on the part of the one from whom

such fact is concealed of the existence of the fact concealed; (d) intention that the concealment be acted upon; and (e) resultant damage. Carpenter v. Donohoe, 154 Colo. 78, 388 P.2d 399; Morrison v. Goodspeed, 100 Colo. 470, 68 P.2d 458, 71 P.2d 154."

This does not measure the conduct of Mr. Southerland. As the court found at the request of the *plaintiff*: "The evidence indicates no intentional attitude or desire of Mr. Southerland to defraud anybody. . . ."[6]

Here there was non-disclosure but no "concealment," intentional or otherwise. Nor was there any evidence to prove that Southerland or PMM had knowledge that they were concealing facts concerning the method of pricing inventory items.[7]

Indeed, prior financial statements had been furnished and from May 1, 1959, until November 1959, when the transaction was closed, Franklin was in charge of operations with no suggestion that inventory pricing methods were concealed or attempted to be concealed. We recognize the deference that should be given to the trial court's findings and conclusions on such a critical issue. But when those findings are inconsistent with each other, there must be a careful examination of the underlying facts. Here Southerland was available at all times and completely cooperative. All that needed to be done to confirm that Franklin's formula was being followed as Franklin thought it should be, would have been to ask Southerland or look

6. The court also found that the failure to disclose constituted "constructive fraud." In another finding the court said the plaintiff was damaged by the defendant's "fraud." In another finding the court termed the failure to disclose as "negligent"; and in still another, that the injury "was attended by circumstances of constructive fraud, or a wanton and reckless disregard of the plaintiff's rights."

7. Finding of Fact Number Thirteen made at the request of the defendants is as follows:

"13. Culp and his staff attempted to price the inventory items in Venezuela at the lower of the first in first out landed cost or the replacement cost *from Peticon's regular suppliers on April 30, 1959.* Peticon had followed this method of inventory pricing in prior financial statements. Culp and his staff did not make any substantial errors in the costing phase of the work." (Emphasis supplied).

This interpretation of the formula had not only substantial, but impressive support. *See supra,* n. 5.

at his records. Nondisclosure, yes; fraudulent concealment, no.

In Glisan v. Smolenske, 153 Colo. 274, 387 P.2d 260, 262 (1963), the Colorado court said:

"We disagree with the trial court in finding that there was a fraudulent concealment of the soil condition by Glisan. Mr. Smolenske testified that he had observed caissons being constructed for the house next to the one he was negotiating to purchase, and that in discussing it with Glisan, he was advised about the soil condition by Glisan. This discussion took place before the agreement was effectuated by the parties.

\*　　\*　　\*　　\*　　\*　　\*

"Failure of the Smolenskes to establish a case of fraudulent concealment results in the extinguishment of that portion of the judgment awarding exemplary damages."

Likewise here, the inventory pricing information was easily available to Franklin. If Franklin did not choose to look, or if looking, did not see, it may still complain of failure to affirmatively disclose, but not of fraudulent concealment.

■ "Constructive fraud," as defined by the Colorado courts, is distinguished from actual common law fraud in that it lacks the element of intentional wrongdoing which was also absent here. In United States Nat. Bank v. Bartges, 122 Colo. 546, 224 P.2d 658, 664 (1950), the court adopts with approval a definition of constructive fraud by the Kansas Supreme Court:

" 'Constructive fraud consists in any act of omission or commission contrary to legal or equitable duty, trust or confidence justly reposed, which is contrary to good conscience, and operates to the injury of another. The former [fraud] implies moral guilt; the latter may be consistent with innocence.' " Clay Center v. Myers, 52 Kan. 363, 35 P. 25, 26 (1893).

We can agree with the finding of the court that there was no intentional desire of Mr. Southerland to defraud anybody, certainly no moral guilt within the Colorado definition, and therefore, no actual fraud. We hold open for the moment the court's finding of constructive fraud.

## DIAMOND BIT PROBLEM

One particular item for which substantial damages were allowed involved diamond bits used in drilling oil wells. Peticon obtained the core barrels and diamond bits from their manufacturer, Drilling & Services, Inc. (D & S) in Dallas, Texas. It then sold the bits to the oil companies with the understanding that the companies could return used bits and would receive credit for any re-usable diamonds which were salvaged. Whenever a diamond bit was returned to Peticon by an oil company purchaser, it would be shipped to D & S. That concern would extract the re-usable diamonds, store them for Peticon's account and send Peticon a memo of the salvage by carats and quality. Peticon would then issue a credit memorandum to the oil company based upon the price the oil company had paid for the diamonds when the bit had been sold. As a result, two entries would be made upon the Peticon books. One would reflect as an asset the value of the diamonds being held by D & S for Peticon's account; the other would be a liability represented by the credit memorandum given to the customer for the diamonds he had purchased and returned.

A question was raised as to diamond valuation by Franklin employees when they took over management and control of Peticon on May 1, 1959. As a result, Kerin, a vice president of Franklin, went to Dallas to see D & S in July. Thereafter, Kerin wrote to Southerland and gave him specific instructions on how to value the diamond inventory on the PMM audit of July 30, 1959. Southerland recomputed the diamond valuation accordingly and showed it in the July 30, 1959 audit as instructed. The court found that Kerin saw the audit and knew when he saw it that the diamonds had been valued as he had ordered.

The damage claim arises in part because Franklin went back two years preceding its assumption of control and determined that a total of 36 bits had been sold. This, argued Franklin, meant an undisclosed liability for diamond credits when the bits were turned in for salvage. Servicios responded that when the credit was given for salvaged diamonds, the company would at the same time receive the diamonds of equal value which would off-set the liability.

The damage award for improper handling of the diamond inventory totaled $71,648.47. It was based on the loss which was sustained on sale of diamonds in inventory on April 30, 1959; loss on those acquired from customers after April 30, 1959 to September 30, 1960; and credits issued or due for the period October 1, 1960 to August 31, 1961.[8]

The findings of the court upon which liability as to diamonds is based are not entirely helpful to a solution of the problem. Some of them are combined with valuation of the other inventory items although the facts are different as to each.[9] The evidence of the plaintiff as to inventory other than diamonds, was to the effect that PMM applied its own understanding of "lower of cost or current replacement value." The evidence as to valuation of the diamond inventory is quite different. Before the July 30, 1959 audit report of PMM was ever issued, Kerin, on behalf of Franklin, instructed Southerland how to value the diamond inventory and those instructions were followed. The court's findings of fact uniting the method of general inventory valuation with the diamond inventory valuation is, therefore,

[8] Exhibit 73 is a compilation of this aggregate figure made by Mr. Fox, whose testimony was accepted by the trial court.

| | Cost | Sales Date | Amount | Gain or Loss |
|---|---|---|---|---|
| April 30, 1959 Inventory | $40,354.56 | 2/ 8/61 | $13,720.77 | ($26,633.79) |
| Diamonds acquired from customers after April 30, 1959 to September 30, 1960. | 42,641.54 | 2/ 8/61 | $12,502.29 | ($30,139.25) |
| Credits issued or due October 1, 1960 to August 31, 1961 | 19,098.61 | 2/12/62 | $ 4,223.18 | ($14,875.43) |
| Total | | | | ($71,648.47) |

9. Finding of Fact Number 4.

"4. Issue: Did officers or employees of the plaintiff or of Peticon Division-Franklin Supply C.A.:

(a) Participate in the valuation of the diamond and/or other inventory of Peticon?

Answer: Yes, to some extent, but not to such an extent as would remove the responsibility of Mr. Southerland.

(b) Have knowledge of the condition and salability of the diamond and/or other inventory of Peticon at the time the audit report was issued or at the time of the exchange of consideration between the plaintiff and Servicios?

Answer: Yes, but not to the extent it would remove the responsibility of the defendants.

(c) Have knowledge of the methods used in valuing the diamond and/or other inventory of Peticon at the time the audit report was issued or at the time of the exchange of consideration between the plaintiff and Servicios?

Answer: No, at least not to the extent that it would change the situation here concerned.

"5. Issue: Would the plaintiff be barred from asserting that the diamond and/or other inventory of Peticon was not properly valued if officers or employees of the plaintiff or Peticon Division-Franklin Supply C.A. did or knew any of the above?

Answer: No, only if the major United States officers of the plaintiff had full knowledge, which they did not."

contrary to the evidence that the pricing of the diamond inventory was upon Franklin's express orders.

Nonetheless the court appears to say clearly (1) that Franklin employees did participate in the valuation of the diamond inventory "but not to such an extent" as would remove the responsibility of Mr. Southerland; (2) that the plaintiff would not be barred from asserting that the diamond "and/or" other inventory of the plaintiff or Peticon had not been properly valued, unless the "major United States' officers of the plaintiff had full knowledge, which they did not." Finding of Fact Number Seventeen as requested by the defendant found that Kerin stopped at Dallas on July 19 or 20. After he reached Denver he wrote a letter to Southerland, dated July 21, saying that D & S was to cable him *instructing* him how to value the diamonds. Finding of Fact Number Eighteen tells us that the salvaged diamonds were valued in accordance with the Kerin instructions.[10] The letter giving the instructions is on the Franklin letterhead, dated July 29, 1959 addressed to Southerland and signed "Peticon Division, Franklin Supply C. A. by W. H. Kerin, Jr., Vice President." It is exhibit W in evidence.

■ The only explanation for the court's ruling in view of the evidence is the finding that the plaintiff would not be barred from objecting to diamond inventory unless the "major United States' officers of Franklin had full knowledge, which they did not." On this view of the law, it is to be noted first that Kerin was the man sent to Venezuela by Harper at the beginning of negotiations to investigate Peticon. He visited all Peticon stores and reported on inventory. He was with Harper when Harper went to visit Peticon. He, with Harper, met with Servicios directors when the "handshake agreement" was made on February 28, 1959. He was one of two who signed the formal agreement on behalf of Franklin upon the express authorization and instruction of Harper. Kerin was one of Franklin's principal United States officers. Moreover, the law is clear that the knowledge of an agent is imputed to his principal particularly when he is in the executive echelon as Mr. Kerin was. Schoenbaum v. Firstbrook, 405 F. 2d 200, 211 (2d Cir. 1968), cert. denied, Manley v. Schoenbaum, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); Sanders v. Magill, 9 Cal.2d 145, 70 P.2d 159, 163–164 (1937); Mayer Oil Co. v. Schnepf, 100 Colo. 578, 69 P.2d 775, 777 (1937); Kingdom of Gilpin Mines v. McNeill, 88 Colo. 44, 291 P. 1036, 1037 (1930).

■ Thus, if the diamonds were overvalued, it was by Franklin and not by PMM. As to the valuation of diamonds acquired *after* April 30, 1959, the agreed valuation date, PMM would have no responsibility since those valuations were not relied upon to establish book value. Finally, there was no witness who testified that PMM did not properly state the value of the diamonds in the audit report of April 30, 1959.[11] Unless there was

---

10. "17. *Kerin* stopped at D & S in Dallas on July 19 or 20 on his return trip from Venezuela to Denver. After he reached Denver *he wrote a letter dated July 21, 1959* (Exhibit W) *to Southerland* in which he advised Southerland that D & S, *'is to cable you today verifying this fact and instructing you to use the original invoice value of the diamonds, which is the list at that time less our ten percent'.*" (Emphasis supplied).
"18. The salvaged diamonds were valued in Exhibit 24 in accordance with the instructions from Kerin in Exhibit W."

11. Mr. Fox, upon whose testimony the court expressly relied to establish the diamond bit liability, was an employee of Alexander Grant Co., a national accounting firm. He testified:
"Q. Mr. Fox, do you, as a representative here from Alexander Grant, express any opinions with respect to these diamonds as to whether or not they were stated correctly on the Peat, Marwick report of April 30, 1959?
"A. No, sir, I do not."
R.T. at 1158.

some negligence or other dereliction of legal duty on the part of PMM in pricing the bit diamonds, there could be no liability.

The court also made findings as to diamond bits which had been sold to oil companies but had never been presented for diamond salvage credit. It found that such bits "constituted a potential liability which would affect the book value of Peticon as shown on the financial statement." [12]

No dollar value was placed on this finding, but in Conclusion of Law Number 6 "the failure to disclose liability for redemption of salvage diamonds as set forth in finding 24, . . ." was one of the factors, along with failure to define the valuation formula, and failure to disclose Southerland's affiliations, which constituted "constructive fraud." [13]

■ With respect to the asserted failure to disclose this "potential liability," both Mr. Carman Blough and Mr. Robert Trueblood [14] gave expert testimony that PMM handled this phase of the audit properly. Both testified that it was not necessary to show any such liability.[15] There was no expert testimony to the contrary. Under such circumstances where the answer is one requiring evidence from a professional and that evidence is received, not contradicted and no reason appears to doubt the credibility of the witness or the accuracy or inherent probability of the opinion, the fact should be deemed established. *See,*

*e. g.,* International Shoe Co. v. Federal Trade Commission, 280 U.S. 291, 299, 50 S.Ct. 89, 74 L.Ed. 431 (1929); Ariasi v. Orient Insurance Co., 50 F.2d 548, 551 (9th Cir. 1931).

The award of damages for diamond bits in the sum of $71,648.47 cannot be sustained.

## DAMAGES

1. *The $200,000 Award for Over Valuation of Inventory.*

The principal basis of the claim of over-valuation of inventory came from a subsequent audit and valuation by Arthur Andersen & Co., competing certified accountants, who re-examined the valuation of the inventory made by Peat, Marwick, Mitchell & Co., and adjusted it downwards in the sum of approximately $465,000.

Although officers of Franklin participated in the taking of the inventory originally and requested and obtained a downward revision in its valuation because of slow moving, obsolete and junk items, the trial court was of the view that this and other participation was not of such importance that it should constitute an estoppel or waiver. Thus, one of the elements of recovery allowed by the trial court was the sum of $200,000 as compensatory damages because the court found that the inventory was overpriced by PMM to that extent in its report on the examination of the value of the net assets of Peticon. Therefore,

12. The court also found that Gene Harper (president of Franklin) was aware at the time of the negotiations in February, 1959, "that the oil companies possessed used drilling bits which could be, but had not been presented for salvage diamond credit." C.T. 1624.

13. Finding Number 24:
"24. None of the Peticon financial statements which have been introduced in evidence (Exhibits 33, 20, AY, AZ, BA, BB, CN, CO, 24, 25, 26 and 27) state the manner in which salvage diamond credits may be redeemed." C.T. 1625.
Contrasted, we note Finding Number 23:

"23. Gilbert Davies, the retiring General Manager of Peticon, told Russell Smith, his successor, that it was Peticon's policy to redeem salvage diamond credits on puchases of new diamond bits and to refuse to redeem such credits in any other manner. This conversation occurred sometime between mid-April and mid-June of 1959." C.T. 1625.

14. Their qualifications given in part, *supra* n. 5.

15. Mr. Blough explained that an auditor would have no way of knowing how many bits would be returned. Some could be lost in the hole; some discarded or thrown out by workmen or never returned for other reasons.

because of this over valuation, the logic is that Franklin was required to pay to Servicios $200,000 more than it should have paid for the stock of Peticon. The acts of PMM are charged to have been a breach of contract, tortious and the result of a conspiracy between Servicios and PMM.

However, Servicios had already reduced the purchase price of the stock of Peticon by the sum of $200,000 in the settlement of the Colorado litigation because of the same claims which Franklin later made against PMM. In the Colorado litigation Servicios had sued on the notes and Franklin counterclaimed for rescission and for damages; Franklin had also attempted to join PMM as a codefendant. Likewise, in the Colorado litigation, Franklin alleged in its counterclaim that PMM conspired with Servicios to do the things which it asserted were wrongful and had resulted in damage, just as Franklin has asserted a conspiracy claim in the present litigation.

Appellant argues that the award of compensatory damages for over-valuing inventory, thus increasing the price of the stock, amounts to a double recovery to the extent that the Colorado settlement had already effected a reduction in price for the same reasons. The court found in Conclusion of Law Number 10 that the Colorado settlement did not affect the rights of the parties to this action. We disagree with that conclusion.

In Husky Refining Co. v. Barnes, 119 F.2d 715 (9th Cir. 1941), we referred to the general rule of damages that:

". . . whether the tortfeasors be joint or independent, the injured party is entitled to no more than compensation for his injury; and . . . consideration received from one, for the release of any claim against him, operates to reduce pro tanto the amount recoverable from the other."

Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 348, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); Aro Mfg. Co. v. Convertible Top Co., 377 U.S. 476, 503, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964). DePinto v. Provident Security Life Insurance Co., 374 F.2d 37, 49 (9th Cir.), cert. denied, 389 U.S. 822, 88 S.Ct. 48, 19 L.Ed.2d 74 (1967), approved that rule. It is followed in California, Laurenzi v. Vranizan, 25 Cal.2d 806, 155 P.2d 633 (1945), and also in Colorado, Cox v. Pearl Investment Co., 168 Colo. 67, 450 P.2d 60, 63 (1969). See also Prosser, Torts § 46 at 272 (3d ed. 1964). In Cox the Supreme Court of Colorado held, however, that where a settlement agreement contained in express reservation of rights that the rights of those who settled should not be foreclosed against others who may have also been liable for the wrong.

Here the Colorado settlement attached to the Second Amended Complaint provided that all of the stock of Peticon should be delivered to Franklin at such time as all payments by Franklin have been made. The balance of the payments settled upon in the Colorado litigation for all of the Peticon stock aggregate $800,000, instead of the $1,000,000 originally agreed upon, or a reduction of $200,000. There was a "Supplemental Stipulation" entered into, dated the same day as the original stipulation, which recited that its provisions "are added and shall be construed as though set forth in said original stipulation." It provided:

"It is the express intention of the parties that no provision of this stipulation shall be construed as a release of Peat, Marwick, Mitchell & Company, or any partnership, group or organization doing business under that name, or any partner thereof, for liability, if any, arising from his services as an accountant."

This reservation of rights together with the attempts of Franklin to join PMM in the Colorado litigation would strongly indicate that Franklin at those times

considered PMM a joint tortfeasor.[16] The recovery received from Servicios pursuant to this Colorado settlement would, therefore, reduce *pro tanto* the amount Franklin could recover from PMM for the same injuries.

The trial court here concluded as a matter of law that:

"On the totality of the evidence, . . . the court finds that the inventory . . . was overpriced to the extent of $200,000 of a claimed amount of approximately $465,000."

The court thus held in this case that since the inventory was overpriced to the extent of $200,000, the book value of the stock of Peticon was to the same extent overstated. The balance due on the notes from Franklin to Servicios should therefore be reduced by that amount or from $1,000,000 as per the original audit, to $800,000 or a net reduction of $200,000. But, there had already been a settlement in the Colorado litigation which became a judgment of that court, effecting a reduction in purchase price of $200,000 based upon substantially identical issues, *e. g.*, overvaluation of inventory because of alleged wrongful use of the formula and non-disclosure. The same conspiracy count was also charged to Servicios and PMM in both actions. The appellee may not recover twice for this same injury.

Our decision to disallow the recovery of $200,000 a second time is not a violation of the so-called "collateral source" rule. Appellee cites four cases in support of the proposition that double recovery may be permitted here by application of the collateral source rule. In Helfend v. Southern California Rapid Transit District, 2 Cal.3d 1, 84 Cal.Rptr. 173, 175, 465 P.2d 61, 63 (1970), the court stated the collateral source rule to be:

". . . if an injured party receives some compensation for his injuries from a source wholly independent of the tortfeasor, such payment should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor." 84 Cal. Rptr. at 175, 465 P.2d at 63.

In that case a personal injury plaintiff successfully excluded evidence by which the defendant would show the jury that a portion of plaintiff's medical bills had been paid through a medical insurance plan. The court said that the defendant should not be able to avoid payment of full compensation for the injury inflicted merely because the plaintiff had the foresight to provide himself with insurance.

Appellee also cited Gypsum Carrier, Inc. v. Handelsman, 307 F.2d 525 (9th Cir. 1962); United States v. Shipowners & Merchants Tugboat Co., 103 F. Supp. 152 (N.D.Cal.1952), aff'd 205 F. 2d 352 (9th Cir. 1953), cert. denied, 346 U.S. 829, 74 S.Ct. 51, 98 L.Ed. 353 (1953); and Publix Cab Co. v. Colorado National Bank, 139 Colo. 205, 338 P.2d 702 (1959). The first two cases arise under admiralty law. While they recognize the collateral source rule as a rule of federal law where applicable, *Gypsum Carrier, Inc.* points out that in the usual situation, a federal court is called upon to apply it as a rule of state law. Again, assuming Colorado law on damages is the proper rule to apply,[17] the Colorado cases do recognize the rule, but in a situation inapposite to the case under examination.

The most recent case we have found on the subject is Kistler v. Halsey, Colo.,

16. In its second motion to bring in PMM as a third party defendant in the Colorado litigation, Franklin asserted as part of the grounds for its motion:

"2. The acts of the proposed Third Party Defendant in the course of the transaction between Plaintiff and De-

fendant were and are inseparable from the transactions and disputes between Plaintiff and Defendant . . . ."

17. No question was raised or evidence introduced on this point as to the law of Venezuela which would be the competing conflict of laws jurisdiction.

481 P.2d 722 (1971). There, an action was brought to recover for injuries sustained by a bicyclist when his bicycle collided with the defendant's pick-up truck. The court did not permit the jury to consider the plaintiff's claim for loss of wages while he was away from work recovering from his injuries. The evidence disclosed that the plaintiff was actually paid his full wages pursuant to his company's employment policy. The Supreme Court of Colorado held this ruling to be erroneous.

> "The principle of the collateral source doctrine has been recognized by this Court in the following cases: Pueblo v. Ratliff, 137 Colo. 468, 327 P.2d 270; Carr v. Boyd, 123 Colo. 350, 229 P.2d 659; Riss & Co. v. Anderson, 108 Colo. 78, 114 P.2d 278; King v. O. P. Baur Co., 100 Colo. 528, 68 P.2d 909. Simply stated, it is that compensation or indemnity received by an injured party from a collateral source, wholly independent of the wrongdoer and to which he has not contributed, will not diminish the damages otherwise recoverable from the wrongdoer. We adopt what we believe to be the majority view and hold that the doctrine is applicable where the source of compensation is wages paid by an employer under an employment rule or policy providing for sick leave and accumulation thereof." 481 P.2d at 724.

 Franklin claimed to have suffered one single, indivisible injury under the contract, which was over-valuation of inventory resulting in over-statement of book value of the stock being purchased. The means by which this injury was alleged to have been caused were several: negligence, breach of express and implied warranty, fraud, and conspiracy by both Servicios and PMM. The injury having been determined in the Colorado action against Servicios and no greater injury or damage having been established against PMM for the same alleged injury, a second recovery may not be allowed. In the present action the additional compensation paid and received was not from a "collateral source" but from one charged with causing the same injury with which PMM is being charged.

Appellee asserts that its loss far exceeds the $200,000 for which recovery was allowed, and refers to its attorneys' fees, costs, travel, etc. The point here is, however, that the recovery of the $200,000 was for a particular injury for which recovery had already been effected. That recovery did not prevent appellee from proving additional elements of damage as it did attempt to do.

## THE AWARD OF PUNITIVE DAMAGES

The court concluded as a matter of law that in the light of Finding of Fact Number 51 the plaintiff was entitled to recover exemplary damages in the amount of $150,000.[18]

 Assuming, *arguendo*, that the law of Colorado is controlling, exemplary damages may only be recovered where the wrong complained of is within the language of the Colorado statute permitting such damages. Exemplary damages are entirely a matter of statute. Denver Tramway Co. v. Cloud, 6 Colo. App. 445, 40 P. 779, 780 (1895), approved in Gray v. Linton, 38 Colo. 175, 88 P. 749 (1906).

The controlling Colorado statute provides:

> "In all civil actions in which damages shall be assessed by a jury for a wrong done to the person or to personal or real property, and the injury complained of shall have been attended by circumstances of fraud, malice or insult, or a wanton and reckless disregard of the injured party's rights and feelings such jury, in addition to the actual damages sustained by such

---

18. Finding of Fact Number 51:
 "The injury of which the plaintiff complains was attended by circumstances of constructive fraud, or a wanton and reckless disregard of the plaintiff's rights. Under Colorado law, the plaintiff is entitled to exemplary damages in the amount of $150,000."

party, may award him reasonable exemplary damages." Colo.Rev.Stat. 41–2–2.

This statute does not equate punitive damages with constructive fraud. Neither does the Colorado definition equate with constructive fraud "a wanton and reckless disregard of the plaintiff's rights." *See* United States Nat. Bank v. Bartges, *supra*, 122 Colo. 546, 224 P. 2d 658 (1950).

■ For all of the reasons which we have heretofore set out in reciting the facts, we simply cannot find fraud or a "wanton and reckless disregard of the plaintiff's rights." In a situation where the conduct was more oppressive and wanton than here, this court declined to support an award of punitive damages under the similar California statute. Security First Nat. Bank v. Lutz, 297 F.2d 159, 164 (9th Cir. 1961).

It is apparent from the record that the trial judge had difficulty finding facts to justify such an award. When discussing his proposed findings he said:

> "In that respect I come back to my statement that I do not in any sense imply any intentional fraud to Mr. Southerland, but the results, actually, although there was this honest but negligent misrepresentation, and as the cases set forth in the plaintiff's brief indicate, it does constitute, in effect, a constructive fraud. The results are the same as though the fraud were intentional." R.T. 2438.

We disagree with the rationale of the court. Assuming honest but negligent misrepresentation, the fact that the consequences are even of considerable magnitude does not in this case enlarge the "honest but negligent" into "intentional fraud" as of the date when the negligence occurred.[19]

Apart from the invalidity of the award of punitive damages under Colorado law, we find difficulty in the court's selection of the law of Colorado as the applicable law upon these facts. That conflict of laws decision was potentially determinative since it was conceded that the law of Venezuela makes no provision for an award of exemplary damages.[20]

The basis of Franklin's claim of punitive damages is in tort. It was alleged that the conduct of the defendant was fraudulent, that it was also negligent and that it was the result of a conspiracy. The trial court did not make the type of findings as to choice of law which it should have made in order to determine the rights and liabilities of the parties. Finding of Fact Number 15 adopts the California statutory choice of law rule as to the interpretation of the contract and the rights and obligations which flow from it. (Cal.Civ.Code § 1646.) Without any discussion of the tortious foundation of the claim for punitive damages the court, by way of finding of fact, simply concluded that "Colorado law governs the issues with respect to damages."[21]

■ In a diversity case the federal court must follow the law of the jurisdiction in which the complaint is filed, including the conflict of laws rules of that state. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Moore v. Greene, 431 F.2d 584 (9th Cir. 1970).

California has declined to follow the traditional "lex loci delicti" rule in all tort cases regardless of the type of wrong or the particular issue involved. In

19. At another point in the record, the court commented:

> "As I said before, it seems to me that this is a case for exemplary damages because of what I find to be the constructive fraud, substantial negligence and the failure to disclose, as is implicit, but if you can't sustain that without showing—without a finding of malice or insult, I just can't stultify myself in saying that I think that Mr. Southerland was malicious, or that he was insulting." R.T. 43.

20. Testimony of Dr. Rene de Sola, R.T. Partial Trial at 313.

21. Conclusion of Law Number 16 on Partial Trial.

Reich v. Purcell, 67 Cal.2d 551, 63 Cal. Rptr. 31, 432 P.2d 727 (1967), the California Supreme Court held that the forum "must search to find the proper law to apply based upon the interests of the litigants and the involved states." 63 Cal.Rptr. at 33, 432 P.2d at 729.[22] There, the law of Missouri, where the automobile accident occurred, limited damages for wrongful death. Neither Ohio, the domicile of the plaintiffs, nor California, the domicile of the defendants imposed such a limitation. After considering the interests of the domiciles of both parties and the interests of the State of Missouri, the court rejected the law of the place of the wrong and followed the law of Ohio, the domicile of the plaintiffs. This court followed a similar course in a different kind of tort action in Moore v. Greene, *supra.*

Applying that same technique we note that Colorado, as the domicile of the plaintiff corporation, has an interest in imposing a penalty upon those seeking to take advantage of its citizens both individual and corporate. It may also have an interest in deterring fraudulent practices. The statute authorizing exemplary damages, however, is couched in terms of some caution providing that in limited circumstances a jury "may award . . . reasonable exemplary damages." Such caution is in accord with general principles of law that exemplary damages are not favored. In Gombos v. Ashe, 158 Cal.App.2d 517, 322 P.2d 933, 939 (1958), the court said:

> "There are certain fundamental principles that must be kept in mind. Punitive damages are allowed in certain cases as a punishment of the defendant. They are not a favorite of the law and the granting of them should be done with the greatest caution. They are only allowed in the clearest of cases."

Venezuela does not provide for punitive or exemplary damages under its

civil law. Its policy in that regard must be that adequate compensation as well as deterrence is effected by its ordinary remedies. To impose punitive damages upon an entity operating in Venezuela might well be offensive to its system of jurisprudence and its public policy.

> "Probably the most important function of choice-of-law rules is to make the interstate and international systems work well." Restatement (Second) of Conflict of Laws, *supra*, n. 22, § 6, comment d at 13.

Very few if any of the significant relationships between the parties in their dealings concerning this matter took place in Colorado. The contract containing the pricing formula which was the basis of the defendant's employment was concluded and signed in Venezuela; the employment of defendant to make the audit was in that country; the defendant's office in Venezuela is a separate entity there, although affiliated nationally and internationally with the PMM organization; all of the defendant's work on the audit was performed there and the written report was issued from there; and the burden of punitive damages will be laid upon a citizen or entity of Venezuela.

█ We determine therefore that the choice of law is that of Venezuela and not Colorado, and that upon the merits and upon conflict of laws principles the award of punitive damages must be set aside.

To sum up this very complicated and vigorously contested problem:

1. We affirm the trial court's findings of fact and conclusions of law that the defendant's written report should have disclosed (a) the prior and existing relationships of Southerland to Servicios and (b) the defendant's interpretation of the pricing formula as stated in the contract. On the basis of sharply disputed testimony we also affirm the

22. The rationale is likewise that of the American Law Institute. *See* Restatement (Second) of the Law, Conflict of Laws § 145 (1971). *See also* James v. Powell, 19 N.Y.2d 249, 279 N.Y.S.2d 10, 225 N.E.2d 741 (1967).

trial court's conclusion that the failure to make the disclosures herein referred to was negligent.

2. We affirm the trial court's finding of damages based upon over-pricing of inventory in the sum of $200,000; but find in that regard that the plaintiff has already been completely compensated in that amount by the stipulation and judgment in the Colorado action, and is therefore not entitled to a double recovery from PMM.

3. We affirm the trial court's judgment to the effect that the present action is not barred under either Colorado or Venezuela law by the Stipulation and Amendment Reserving Rights taken in the Colorado litigation.

4. We affirm the award of the trial court of the following items of damage, awarded in connection with the Colorado-Venezuela litigation:

(a) Attorney's fee to Benson in the sum of $40,000.

(b) Amount paid PMM for audit study in the sum of $947.46.

(c) Amount paid PMM for analysis of bit inventory, $408.

(d) Amount paid to Alexander Grant & Co. in the sum of $3,800.

(e) Amount paid to Arthur Andersen in the sum of $17,200.

(f) Amount for services to Mr. Bryant, $1,504.

5. For the reasons stated in the opinion we reverse the award of damages for allegedly overpricing diamonds and the asserted loss from sale of the diamond inventory, in the sum of $71,648.-47; we also, for the reasons stated, reverse the award of punitive damages in the sum of $150,000.

6. Interest shall accrue on all awards of money from the date the judgment was entered in the district court. Each party shall bear its own costs and attorneys' fees in this litigation.