**CONVOY CORPORATION, an Oregon Corporation, Appellee,**

v.

**SPERRY RAND CORPORATION, a Delaware Corporation, Appellant.**

No. 77–2920.

United States Court of Appeals, Ninth Circuit.

April 25, 1979.

Wayne Hillard, Dezendorf, Spears, Lubersky & Campbell, Portland, Or., Thomas A. H. Hartwell, San Francisco, Cal. (argued), for appellant.

Terry W. Baker, Tonken, Galen & Baker, Portland, Or., Barbee B. Lyon, Portland, Or. (argued), for appellee.

Before WRIGHT and GOODWIN, Circuit Judges, and THOMPSON *, District Judge.

GOODWIN, Circuit Judge:

After a disappointing performance by a new computer system for the routing, planning, and management of its nationwide automobile transport business, Convoy Corp. sued Sperry Rand for damages. Convoy recovered in a court trial. Sperry Rand appeals, contending that a substantial part (if not the entire amount) of the trial court's judgment is a double recovery. Sperry Rand contends that Convoy recovered the same damages from another supplier of computer services in an out-of-court settlement of another case.

In August, 1969, Convoy entered into a contract with a computer-technology firm known as WOFAC. For $100,000, WOFAC agreed to design for Convoy a computer system for route planning, dispatching and other operations. WOFAC said it had designed for another firm a similar system that could be adapted to Convoy's needs, with a net saving of $215,000 a year for Convoy.

After soliciting bids from various computer manufacturers, Convoy decided in November 1969 to lease the necessary computer equipment from Sperry Rand (Univac). At WOFAC's recommendation, Convoy ordered a 9200 II Univac computer,

* The Honorable Bruce R. Thompson, United States District Judge for the District of Nevada, sitting by designation.

with two model 8411 discs. Univac told Convoy, however, that the 8411's might not be available by February 1970, the date by which Convoy wished to switch over to computerized routing and dispatching. After examining two design books prepared by WOFAC, Univac told Convoy that two model 8410 discs would adequately perform the job.

On November 14, 1969, Convoy signed a standard Univac lease agreement. The lease had a five-year term, a provision that Univac would service the equipment, and an option to purchase. The lease also provided that Univac would not be liable for "any indirect, special or consequential damages such as loss of anticipated profits or other economic loss." It also contained a provision that Univac's professional personnel would be available to advise Convoy concerning implementation, review, and improvement of existing data processing systems.

In a separate letter, Univac also agreed that "[i]n support of the programming efforts intended by Convoy personnel, Univac programmers under the direction of the assigned project leader will test and debug programs with the intent of providing a satisfactory work load scheduled to coincide with the delivery of the equipment." In December of 1969, Univac and Convoy worked out a division of labor for writing "peripheral" programs necessary to make the system work: Convoy would write four difficult programs, and Univac 17 less difficult ones.

The program writing took more time than anticipated. When the Univac computer was installed on March 12, 1970, the programs were not yet available. There was substantial testimony, and the trial court found, that Univac reneged on its oral promise to have four programmers available to do Univac's share of the programming. Only one programmer from Univac, Lang, was available to Convoy full time, and there was testimony that the work of the part-time help Univac sporadically supplied was incompetent. Before the computer was installed, it also became clear that

the programs designed by WOFAC were seriously flawed.

On March 27, 1970, Convoy hired Computer Knowledge Corp. (CKC) to write programs, among them some of the programs that Univac had agreed to write. In May 1970, CKC ran a test on the Univac computer and determined that the 8410 discs were too slow for the job Convoy needed, contrary to the earlier promises of Univac. Lang, the Univac project leader, spent a great deal of his time attempting to make the 8410's work in the Convoy system. As a result, he was unable to write many programs. Ultimately, he failed to make the 8410's work compatibly; a program that was supposed to run in 75 minutes took 13 hours instead.

On May 14, 1970, Convoy again ordered 8411's; Univac represented that the conversion from 8410's would be simple. But it was not. CKC had to be called in to do extensive conversion work; WOFAC also had to convert some programs. It took WOFAC until December 1970 to finish its changeover to programs suitable for the 8411's.

The 8411 equipment arrived in June 1970, but it worked only intermittently. The defects were many, and caused losses of entire days' work. Convoy, CKC, and Lang, spent many hours trying to locate the source of several major problems without success. Finally, in January 1971, a field engineer from Univac's San Francisco operation put the 8411's in operable condition.

When Convoy began using the computer system, it learned that its old, manual system of routing and dispatching had been as efficient as the computer. No substantial savings resulted. In July 1971, Convoy canceled the lease under an arrangement with Univac by which Convoy paid rent on the basis of short-term instead of the original long-term rates.

Convoy then sued WOFAC for $516,-129.09, its alleged out-of-pocket costs, more than $1 million in lost profits, and punitive damages, for a total claim of about $2 million. The parties settled the case by a payment by WOFAC to Convoy of $354,500.

Convoy then sued Univac in this action, claiming damages of $216,398.61 for out-of-pocket expenses. All of this amount had been included in the $516,129.09 in out-of-pocket expenses originally claimed against WOFAC in the settled action. As noted, the district court entered a judgment for Convoy in the full amount of its claim and this appeal followed.

## I. DOUBLE RECOVERY

It is agreed that all the items of expense claimed as damages in this case were also claimed as damages in Convoy's action against WOFAC, which was settled. Univac argued in the trial court, and again here, that it cannot be held liable for the full amount of these expenses because they were recovered in the settlement with WOFAC. Moreover, Univac argues that the entire $354,500 Convoy gained in that settlement should be set off against Univac's liability of $216,398.61.

Convoy argues that there should be no setoff, since the payment from WOFAC represented, at least in part, a settlement of Convoy's claims for lost profits and punitive damages, which are not at issue in this case. The trial judge held in favor of Convoy, finding that Convoy's settlement did not fully compensate Convoy for its out-of-pocket expenses. Thus, the court held that Convoy was entitled to recover the full $216,398.61 claimed. Moreover, the court held that, because Univac and WOFAC were not joint obligors, Univac would not have been entitled to any reduction of its own liability to Convoy by virtue of the WOFAC settlement, even if the settlement had fully compensated Convoy for its out-of-pocket expenses.

An examination of the precedents cited by Convoy and Univac suggests that the double-recovery issue lurking in these facts is unusual, if not unique. The cases seem to support two propositions: (1) that a party wronged by a tort or breach of contract is entitled to be made whole, and (2) that a party may not recover more than once for the same wrong. No matter whether liability is characterized as "joint" or "several" or "independent", these concepts should apply with full force. But it is by no means clear that the application of maxims to the peculiar facts of this case will resolve the issue on appeal.

Here, Convoy reached a settlement in an action against WOFAC, which was based on three components of damage: out-of-pocket expenses, lost profits, and punitive damages. In its action against Univac, Convoy seeks neither lost profits (which are presumably unobtainable because of the disclaimer of liability) nor punitive damages.

In the settlement with WOFAC, the $354,500 is allocated in no particular way. If the settlement could be allocated, ex parte, entirely to lost profits or punitive damages, then Convoy could claim that it had not recovered anything for its out-of-pocket expenses. If, however, the sum could be allocated entirely to out-of-pocket expenses, the question would be complicated further because not all the expenses claimed against WOFAC are claimed against Univac. The question actually presented to the trial court is even more complex, because no allocation whatsoever was mentioned in the settlement with WOFAC.

Univac relies chiefly on *Franklin Supply Co. v. Tolman*, 454 F.2d 1059 (9th Cir. 1972). There, Franklin bought from a firm known as Servicios all the capital stock of Servicios' wholly owned subsidiary, Peticon. The book value of the inventory of Peticon was overvalued. In settlement of litigation that followed, Servicios agreed to reduce the purchase price of the stock by $200,000, from $1 million to $800,000. Then, Franklin sued Servicios' accountant for $485,508.47 on account of the overvaluation.

The trial court found that the total amount of the overvaluation was $200,000, and it entered judgment for Franklin in that amount. This court reversed, holding that because the inventory was overvalued by only $200,000 Franklin could recover nothing; it had already received that amount in the reduction of its purchase money liability to Servicios.

From *Franklin Supply*, Univac argues that the proceeds of the settlement with WOFAC should be applied to offset all the

claims by Convoy against Univac. But this argument takes *Franklin Supply* too far. In *Franklin Supply*, the trial court found that the total amount of provable damages due to the overvaluation was $200,000, and this court, accepting that finding, ruled that the plaintiff had already received that full amount in a settlement with a nonparty.

Here, the trial judge has determined that the plaintiff's "out of pocket" exceeded the settlement with the nonparty. Moreover, in *Franklin Supply*, there was no doubt what the first settlement compensated: damages for the overvaluation. Here, it is not clear what components of damage the first settlement compensated. The original claims of the plaintiff in this case, unlike those in *Franklin Supply*, included out-of-pocket expenses, lost profits, and punitive damages. Thus, *Franklin Supply* is distinguishable.

On the other hand, Convoy relies heavily on *Ciluffo v. Middlesex General Hospital*, 146 N.J.Super. 476, 370 A.2d 57 (App.Div. 1977). There, a woman fell down stairs, injuring her neck. At the hospital, a physician examined her X-rays, and sent her home. The next day, a second doctor called her back to the hospital and took further tests, which disclosed a fracture of the spine. The prescribed treatment was accompanied by numerous complications. The woman sued the defendant doctor for the added pain and suffering caused by the extra day she spent away from the hospital after he sent her home. Before bringing the malpractice suit, the woman had settled with the owner of the premises on which she was injured for $30,000.

The doctor argued that because the extra pain and suffering could not have totaled more than $30,000, the case against him should be dismissed. Any liability on his part, the doctor said, would have to be offset by the amount received from the owner of the premises on which the fall occurred. The court disagreed. It declared that the proper method of computing the doctor's liability was for the court to compute the woman's total provable damages, against both the doctor *and* the property owner. From that amount, the court said, the settlement should be deducted; the difference between those two figures was the doctor's maximum liability. Convoy argues that under *Ciluffo*, Univac should be liable for any amounts of out-of-pocket expenses up to and including the difference between (a) the total provable damages against WOFAC and Univac, and (b) the $354,500 WOFAC settlement.

Unlike the defendant physician in *Ciluffo*, the defendant here, Univac, has limited its liability. It is not liable, as WOFAC was, for consequential damages. But in *Ciluffo*, the doctor was not liable, as the property owner was, for pain and suffering between the time of the accident and the patient's arrival at the hospital. Despite this disparity in the defendants' liability, however, the court in *Ciluffo* allowed the plaintiff to proceed against the doctor for damages, up to the difference between plaintiff's total provable damages against both defendants and the amount of the settlement.

■ We have studied the other authorities cited by the parties, and we note that the question is not entirely free from doubt. But we believe that the trial court should have applied the principles enunciated in *Ciluffo* to the facts of this case. Univac is liable to Convoy, but its liability is limited to the total provable damages to which Convoy is entitled from both successive, independent wrongdoers, minus the $354,500 received in the settlement from WOFAC.[1]

The trial court did not find Convoy's total provable damages against the two defendants. It merely stated that the settlement received from WOFAC did not fully compensate Convoy for its out-of-pocket expenses. A remand is therefore necessary for additional factfinding.

## II. CAUSATION

■ Univac also objects to three components of the $216,398.61 judgment, on the ground that there was insufficient evidence

1. In its brief to this court, Univac contends it has a right to equitable contribution from WOFAC; we express no opinion on this point.

to support the implicit finding of the trial court that these components of damage were proximately caused by Univac. These three elements are: $55,549.34 paid to Univac for computer rent and maintenance, $30,513.78 paid to others to rent computer terminals and telephones, and $56,861.85 of the $83,770.52 paid to CKC for programming assistance. Since the meaning of the contract and causation of damages are questions of fact, the trial court's findings of liability on these issues will not be reversed unless they were clearly erroneous. We have carefully examined each component of damages and find no basis for reversal.

Affirmed in part, reversed in part, and remanded.

BRUCE R. THOMPSON, District Judge, dissenting.

I respectfully dissent from the order remanding this case for further trial. The excellent analysis by the majority misses one salient factor. Double recovery as a defense is an affirmative defense. The burden of proof is on the defendant. Fed.R. Civ.P. Rule 8(c). The defense is akin to the defenses of "payment" and "release" specified in the rule, and, if improperly so characterized, is certainly "other matter constituting an avoidance or affirmative defense." Cf. *Duarte v. Bank of Hawaii*, 287 F.2d 51 (9th Cir. 1961).

Univac failed to establish this defense by a preponderance of the evidence. The opinion, which incorporated the findings, of the trial judge, carefully reviewed the evidence relating to the Convoy-WOFAC settlement. The judge found that Convoy did not intend to release its rights against Univac, and also found that Convoy had not, by the settlement, received full compensation for

its out-of-pocket expenses. The trial judge then proceeded to detail specific instances of damage suffered by Convoy as a consequence of the actionable conduct of Univac, independently of any wrongdoing by WO-FAC. These damages aggregated $216,-398.61 and judgment was entered for that amount. Inasmuch as defendant failed to sustain its burden the judgment should be affirmed without qualification.

There is another perspective from which this problem may be viewed. It is true that the trial court did not expressly state that Convoy's total provable damages were a certain sum which was more than $216,-398.61 in excess of the settlement of $354,-500, but such a finding is a necessary inference from the facts which the court did expressly find. The rule in this circuit is that such a finding will be inferred to sustain the judgment. *Wells Benz, Inc. v. United States*, 333 F.2d 89 (9th Cir. 1964).*

---

* "True, they do not state that any party had breached the contracts, and that issue was basic, both to Mercury claims and Wells and Benz' counterclaims; but the lack of an express statement does not necessarily constitute a vital omission, for the rule in this court, as well as in other jurisdictions, has long been that ' * * * whenever, from facts found, other facts may be inferred which will support the judgment, such inferences will be deemed to have been drawn. The findings of fact by a

trial court must receive such a construction as will uphold, rather than defeat, its judgment.' *Clyde Equipment Co. v. Fiorito*, 16 F.2d 106, 107 (9th Cir. 1926); *Carr v. Yokohama Specie Bank, Inc.*, 200 F.2d 251, 255 (9th Cir. 1952; 5 Am.Jur.2d, Appeal and Error, § 844 at p. 288 (1962). And in the cases at bar, the answer to the question who was at fault can fairly be determined from the facts the court did declare."